**D. Dawn HOOKER, Plaintiff,**

v.

**TUFTS UNIVERSITY, et al.,
Defendants.**

**Civ. A. No. 78–2871–N.**

United States District Court,
D. Massachusetts.

Sept. 30, 1983.

Nancy Gertner, Silverglate, Gertner, Baker & Fine, Boston, Mass., for plaintiff.

Alan D. Rose, Danielle E. deBenedictis, Nutter, McClennen & Fish, Boston, Mass., for defendants.

## MEMORANDUM OF EVIDENTIARY DECISIONS

DAVID S. NELSON, District Judge.

The purpose of this memorandum is to record and to clarify the Court's position on various evidentiary rulings made during the course of the trial of this case in April and May of 1983. As the trial progressed, every effort was made to coordinate and to render consistent the necessarily multiple rulings. Substantial effort was also made prior to trial to anticipate objections to certain controverted evidence and to render *in limine* and conditional rulings which might assure an orderly presentation. Despite these attempts, innumerable objections founded on conjunctions of old arguments and new strategy intruded. At times, the sophistry tended to obscure any underlying understanding of my tentative

rulings. Therefore, although much of the reasoning contained in this memorandum has already been communicated indirectly to the parties and is available on the record, in view of the complexities of the trial evidence I exercise my discretion to elaborate upon and hopefully to clarify these rulings.

Two fundamental theoretical questions have coursed through the evidentiary disputes in this case. The first is the issue of comparisons. A key aspect of any Title VII plaintiff's *prima facie* case is an attempted comparison of the treatment she received at the hands of a defendant with that received by others similarly situated. Given that this comparative information or data may well be necessary and appropriate for both parties to an employment discrimination action, it was necessary to determine what categories of employment decisions on the part of defendants were truly comparable and therefore relevant.

Each side attempted to foreclose this exploration by suggesting that certain decisions were *per se* incomparable. Specifically, plaintiff wished to exclude other tenure decisions made during the 1974–75 academic year on the grounds that only employment decisions in the allegedly unique physical education department itself were truly comparative. Similarly, defendant advocated exclusion of all non-tenure employment decisions made in the department during the relevant period, arguing that the special nature of the tenure decision renders *it* unique. As outlined below, the Court declined to accept either view.[1]

■ The second theoretical question is analogous, and goes to the "background of discrimination" doctrine of Title VII law. Given that plaintiff is allowed to present certain general information about the treatment of women at the institution, in order to suggest a discriminatory climate bearing on defendants' intent, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973); *Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106, 113 (1st Cir.1979), (Sweeney II), I must determine which categories or qualities of evidence serve this purpose and the appropriate latitude for defendants' rebuttal. I will exhaust these issues by addressing each major dispute in turn.

PEDARI DECISION

In December of 1974, as a result of Tufts' restructuring of its physical education program, a new position was created. Entitled Director: Programs in Physical Education/Dance, Athletics, and Recreation Intramurals (PEDARI), this was primarily an administrative position geared to coordinating the diverse aspects of physical education at Tufts. In principle, individual coordinators or chairs of the three key areas—Physical Education/Dance, Intercollegiate Athletics, and Recreation and Intramural Athletics—would report to the new Director.

Plaintiff suggested that similarities in the job descriptions for the PEDARI directorship and plaintiff's faculty position rendered Tufts' handling of this decision comparable within the meaning of Title VII and therefore admissible. Although not immediately persuaded on comparability, I found that the PEDARI decision certainly contained enough potential in this regard to warrant additional consideration. I thus overruled, at least temporarily, defendants' standing objection to the admissibility of any non-tenure employment decision. In so doing I reserved for later my consideration of the uniqueness of tenure in academia and the broader question of Title VII enforcement in the academic or professional context.

CARZO PROMOTION

■ Rocco Carzo, Tufts' football coach and a tenured professor in the physical education department, was recommended for promotion by the Tenure and Promotion

---

1. A subsidiary element of the comparison question was the *quality* of information that could be deemed probative without being unnecessarily expansive. Specifically, the Court was often presented with a choice between statistics—from simple tallies to elaborate charts—and volumes of personnel files offered to meet a particular evidentiary burden.

Committee (T & P) in 1982. Plaintiff offered this employment decision as comparable to her tenure review. Given the PEDARI ruling, admissibility of the Carzo promotion file necessarily followed. This decision was directly connected to the tenure and promotion process at Tufts, subject to the criteria within that process, and might well be relevant to plaintiff's *prima facie* case. It is obviously a closer fit than the PEDARI directorship. Professor Carzo was a male colleague of plaintiff's, engaged in some similar although also some distinct activities within the department. He was a key member of the Tufts physical education program and thus his profile and Tufts' treatment of him are both potentially probative of defendants' treatment of Hooker.

## 1974–75 TENURE DECISIONS

Tufts' Tenure and Promotion Committee reviewed twelve other candidates for tenure during the 1974–75 academic year in addition to Dawn Hooker. Defendant sought to admit the results of these other decisions, along with certain references to the T & P's general approach and process that year.

■ These are perhaps the most obviously admissible of all. Tenure is a decision made university wide. A majority of the key actors involved in plaintiff's case were also involved in these other decisions. The so-called "standards," i.e. the level of rigor with which the tenure criteria were applied, although allegedly increasing from year to year would reasonably be expected to have remained constant within that year's decisions. Both male and female candidates were involved, and they met with varied fates. This is the heart of Tufts' defense, and rightly so. Plaintiff's central theory, that the physical education department was a species unto itself, is actually a rebuttal, albeit a creative and somewhat plausible one, of this core premise.

■ I find plaintiff's cited authority to the contrary unpersuasive. None of these cases mandate a general premise for exclusion of cross-departmental comparisons.

For example in *Lamphere v. Brown,* 685 F.2d 743 (1st Cir.1982), where the issue was *not* tenure but salary this Circuit declined to consider cross-departmental comparisons. However, this was on the basis of ample testimony that departments at Brown were completely autonomous in salary setting, and that therefore no valid university-wide comparisons could be drawn. Plaintiff here argues that as departmental recommendations carry considerable weight in Tufts' tenure review process, and as some testimony suggests that the degree of rigor for applying the tenure criteria may vary somewhat from department to department, this case is identical. I disagree. Tenure at Tufts is purportedly based on a university-wide standard. The Tenure and Promotion Committee itself draws these comparisons between candidates. I therefore find that the Court may validly consider making these comparisons as well.

## TENURE AND PROMOTION DECISIONS FOR OTHER YEARS

■ From the perspective of comparability these decisions obviously have attenuated value. The composition of the T & P changes from year to year. Moreover, it has been suggested that the level of rigor in applying the criteria has risen steadily. However, their perhaps minimal probative value as direct evidence of discriminatory motive need not foreclose their potential value as background or indirect inference of intent. (see below) Thus I initially excluded this evidence, but was willing to entertain it if it were presented with proper foundation and in a concise format.

The approach to these four decisions is a simple one. For purposes of threshold admissability, each party received the benefit of the doubt. Plaintiff was allowed to present the PEDARI position and Mr. Carzo's promotion as decisions implicating candidates who were similarly situated and defendants were allowed to present the other tenure decisions that year. This is in keeping with the parties' respective theories of the case and allowed me to reserve

my final judgment on comparability pending the conclusion of the evidence. As to the quality of the evidence available, each side was free to refer to the complete files of these decisions, in order to attempt to flesh out the appropriate inferences of motive in each case. That is to say, once the files were admitted, the parties were free to litigate each of these 11 other tenure cases, the Carzo promotion and the PE-DARI matter if they so chose.

## AFFIRMATIVE ACTION REPORTS

■ There can be no doubt as to the admissibility of these employment reports to establish a climate of discrimination. *Sweeney v. Board of Trustees of Keene State College*, 569 F.2d 169 (1st Cir.1978), *vacated* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), *reaff'd* 604 F.2d 106, 113 (1979). This ruling was established early in response to defendants' First Motion in Limine. The difficulty arose when plaintiff herself attempted to impeach one report's treatment of coach/lecturer positions. While the characterization and actual implementation of coach/lecturer positions may well be relevant to plaintiff's claim, the manner in which Tufts reported these positions to the EEOC is at best collateral. To the extent that plaintiff claims that Tufts manipulated these positions in a discriminatory manner, such a claim may only be furthered by evidence which is more direct. Thus the reports are admissible with all attachments as submitted to the EEOC and speak for themselves. Other documents geared to impeaching these reports are inadmissible.

## TITLE IX DATA

■ Obviously, information as to an institution's Title IX compliance may be characterized as background evidence, and analogies can and have been drawn to affirmative action reports. Also obviously, Title IX information has much more potential background relevance here, when a school's physical education program is put at issue, than for example in the context of a race discrimination claim by a mathematics faculty member. These arguments notwithstanding, I have excluded Title IX data as too expansive and not sufficiently linked to the issue of faculty employment.

No one disputes the fact that Tufts began the seventies with an outmoded physical education program, at the likes of which Title IX was aimed. I am also willing to accept for the purposes of argument that Tufts along with many other universities may have engaged in a certain amount of foot-dragging to comply with the new statute. Nor am I unmindful of situations in which poor funding, facilities and staff have operated as not-so-subtle methods of employment discrimination. My problem here is that the proffered reams of Title IX data do not establish this nexus between funding compliance and tenuring of women faculty.[2] Rather, it is a leap plaintiff asks the factfinder to make on faith—essentially that because Tufts administration may have valued its football team more than women students' access to a weight room, one may infer that defendants have denied tenure to a qualified woman faculty member. While such a series of events is of course imaginable, plaintiff did not convince me that it was likely enough in order to contribute probatively to this action. The weak probative value of this evidence was far outweighed by the prospect of a distracting and peripheral trial on Tufts' compliance with a statute at no way in issue in this case.

But my reservations about the Title IX data are more fundamental. I consider this data particularly risky in the context of a disparate treatment case. Although an admittedly thin line is walked, as an evidentiary matter, between material probative of an inference of intent in a treatment case, and material admissible as direct evidence of discrimination in an impact case, Title IX data by its very nature strikes me as the latter. It is broad-reaching, covering matters of funding, facilities, program structure, staff support and stu-

---

**2.** The importance of establishing such a nexus is acknowledged by plaintiff's own authority. *Isle-boro School Committee v. Califano,* 593 F.2d 424, 430 (1st Cir.1979).

dent activities. The very strategy for requesting the data smacks of classic impact theory; i.e. even if there be no direct evidence of discrimination against a plaintiff in an employment decision, one may consider the *impact* upon her of defendants' other, allegedly discriminatory decision-making as to the structure of the program and the education of students. While plaintiff denies any such agenda, the primary authority cited for her position only seems to illustrate this point.

In *Hill v. Nettleton*, 455 F.Supp. 514 (D.Colo.1978), the court did reference Title IX concerns in finding for plaintiff on sex discrimination in contract renewal (not tenure). The court painted a grim picture of a physical education department permeated by sex discrimination. In addition to finding actual retaliation against plaintiff for furthering women's athletics, it documented a department-wide resistance to change. Neither of these two elements has been presented in this case. Moreover, the *Hill* court specifically found discrimination based on disparate impact in addition to the disparate treatment of plaintiff herself. It was in the context of a disparate impact discussion that the court addressed the completely separate and unequal department system.

Nevertheless, my original order in response to defendants' First Motion in Limine was gauged to preserve the possibility that a more reliable and specific foundation could be laid for this sort of testimony. Although Title IX data *per se* was excluded, plaintiff remained free to present comparative evidence as to budgets and expenditures in the physical education department, "to the extent that such evidence bears directly upon the terms and conditions of plaintiff's employment." Indeed plaintiff's witnesses did testify in a descriptive manner as to the facilities and other support available to women's programs.

Finally, Title IX compliance again became an issue through a back-door reference by defense witness McCarthy. Plaintiff immediately suggested that this collateral reference justified returning to the Title IX debate. I concluded otherwise. Plaintiff was simply reiterating her position that the University was out of compliance with Title IX, and that this fact would be probative of employment discrimination against Dawn Hooker. Plaintiff's secondary argument—that Professor McCarthy's endorsement of Professor Carzo for promotion absent personal knowledge of the state of Title IX compliance impugned her credibility—was completely collateral and unavailing.[3]

## STATISTICAL EVIDENCE

█ This is by no stretch of the imagination a statistical case. On the other hand, it is clear that an individual disparate treatment plaintiff always retains the option of introducing statistical evidence in an attempt to meet the threshold of a *prima facie* case. I thus determined to treat statistics as any other piece of evidence in this trial, i.e. to evaluate the proffer in the context of the testimony, to admit that evidence which I viewed to be potentially probative while not unduly expansive, and to reserve my judgment as to the ultimate weight to be accorded any evidence.

█ Such is the case with defendants' proffer of two charts purporting to show the respective tenure rates for men and women faculty at Tufts during the relevant decade. Obviously the charts can be challenged. But plaintiff's objections to the admissability of this evidence in fact answer themselves. First, up until this point, there had been no evidence of a so-called "revolving door" policy with regard to women faculty. This is properly a theory for impeachment of the charts, not for their exclusion. Secondly, these two rather

---

**3.** Post trial, a related question has developed with regard to one of the exhibits. *Exhibit 177,* included in the parties' joint list from the outset, actually contains comparative funding data of the Title IX variety for Tufts' sports programs. Defendants have submitted a belated objection to this exhibit, citing confusion between the parties as to its content. Although it is technically included in this record in accordance with my standard trial procedures, I am precluded by the above-described ruling from according *Exhibit 177* any weight.

simple charts are capable of impeachment in the usual form. Plaintiff need not litigate other tenure decisions in order to make this challenge. Finally, it goes without saying that even if defendants' charts were absolutely pure and immune from challenge, no favorable statistic in the world could absolve or rebut discrimination otherwise proven in an individual case: a Title VII premise of which the Court is assuredly cognizant. *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 579, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1977).

Plaintiff's arguments aside, I was moved by a more fundamental requirement of fairness to admit defendants' two charts, namely that these may serve as a primary source of rebuttal to plaintiff's inference of a background of discrimination. As indicated above, plaintiff offered university-wide affirmative action information as indicative of Tufts' allegedly discriminatory policies and, thus, motive in this case. Plainly defendants are entitled to combat this inference, and statistics on the precise employment decision at issue—tenure—are eminently relevant in this regard. Plaintiff's continual analogy to the exclusion of Title IX data is unpersuasive for the reasons outlined above.

Plaintiff is of course entitled to reply in turn to these charts. Defendants object to plaintiff's statistical materials for lack of foundation. While possessing some merit, this argument is unpersuasive to me at this stage in the litigation. Trial of this matter ended with the understanding that both parties would be allowed to submit their so-called statistical cases. The relative strengths and weaknesses of these presentations and their actual probative value are matters best left to my ultimate judgment on the merits.

SO ORDERED.