**Maryann E. LAWTON, Plaintiff,**

**v.**

**STATE MUTUAL LIFE ASSURANCE COMPANY OF AMERICA, Defendant.**

**Civil Action No. 92–40141–NMG.**

United States District Court, D. Massachusetts.

May 10, 1996.

Roy A. Bourgeois, Worcester, MA, for plaintiff.

Neil Jacobs, Daniel W. McCarthy, Susan M. Curtin, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

GORTON, District Judge.

On August 25, 1992, the plaintiff in the above-entitled matter, Maryann E. Lawton ("Lawton"), filed suit against State Mutual Life Assurance Company of America ("State Mutual"), for whom she had worked as an at-will employee from 1987 until August 23, 1991. Plaintiff's two-count Complaint sets forth numerous claims of gender discrimination by State Mutual. Count I alleges a violation of federal law, 42 U.S.C. § 2000e–5, while Count II contains parallel allegations under M.G.L. c. 151B, § 4(1). On June 16, 1995, State Mutual filed the pending motion for summary judgment. Plaintiff opposes the motion. For the reasons stated below, the motion will be allowed.

### I. *Factual Background*

The relevant facts are recited in the light most favorable to the non-moving party. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). From 1970 to 1984, plaintiff worked for numerous insurance companies, including the Hartford Insurance Group, Aetna Insurance, and Prudential Insurance. From 1984 to 1987, Lawton worked as the Director of Planning for Central Massachusetts Health Care in Worcester, a health maintenance organization ("HMO"), where she was responsible for contract arrangements with physicians, hospitals and ancillary service providers.

In 1987, Lawton was contacted by Gerald Guarino ("Guarino"), an employee of State Mutual who earlier had worked with the

plaintiff at Prudential. Guarino told Lawton that State Mutual was in the process of developing a joint venture with an HMO in the Boston area and that a person with skills in both insurance and managed care was needed in connection with that project. Lawton interviewed with Robert O'Brien ("O'Brien"), who explained that the joint venture would be with Tufts Total Health Plan, whereby Tufts would provide the network of physicians, hospitals and ancillary service providers while State Mutual would provide medical insurance coverage.[1] O'Brien informed Lawton that a person was needed to put together an operational plan for the joint venture and to make sure that all the pieces fit together. Lawton expressed interest in the job and was subsequently hired at an annual salary of $50,000, a figure she gave to O'Brien as her salary requirement.[2]

When plaintiff began working at State Mutual on July 20, 1987, she worked almost exclusively on the Tufts joint venture until it became operational in the Fall of 1989. In October, 1987, the area in which Lawton worked underwent numerous organizational changes, including: 1) plaintiff began to report to Robert Young ("Young"), the Vice President of Group Life and Health Marketing and Product Development, 2) plaintiff's title was changed from Director of Group Marketing to Group Marketing Services Director, and 3) plaintiff assumed additional duties, including assembling monthly plan reports. Through November 1988, however, Lawton's principal responsibility was the implementation of the Tufts plan.

The first employment action about which plaintiff complains occurred in the Fall of 1987. Soon after Lawton began reporting to Young, he promoted Christopher Brown ("Brown") to fill the newly-created Director of Product Development position. Lawton had known about the position before it was filled and informed Young that she would be interested in applying when it became available. In January, 1988, Lawton learned that Brown had been chosen for the position, and she told Young that she was surprised that it had already been filled. Young allegedly told Lawton that it was "Chris Brown's turn." Plaintiff did not ask Young what he meant by that comment; rather, she inferred that he meant that it was Brown's turn to advance because he had been with State Mutual for several years (whereas she had been with the company for only a few months). Lawton also thought that Brown was not qualified for the job. As a result of the appointment, Brown's annual salary was increased to $48,000 and his Salary Grade Level from 22 to 24.

In early 1990, Young told Lawton that a position had opened in the Managed Care area and asked her if she was interested in the job. Young told plaintiff that the open position would be good for her because it had a "great deal of growth and promotion opportunity attached to it." Lawton Dep. Vol. II at 93. Plaintiff told Young that she was interested in the position because it would give her an opportunity to utilize all of her job skills and also because managed care was on the "cutting edge" of health care.

A second incident which plaintiff claims constitutes gender discrimination arose out of the hiring of Ross Weiner ("Weiner") as a senior consultant in the Group Life & Health Products area. Paragraph 14 of plaintiff's Complaint alleges that, in May of 1991, the company discriminated against her by hiring Weiner "despite the fact that he was less qualified than Plaintiff to assume the responsibilities of this position." In her deposition, Lawton further alleged that Weiner was hired initially as a Salary Grade Level 22 employee but was soon promoted to Level 23 so that he could be included in a company incentive compensation plan. Lawton Dep. Vol. II at 177.[3]

---

1. This type of arrangement is referred to as a "Preferred Provider Organization," or "PPO".

2. Throughout her tenure at State Mutual, plaintiff was an employee with a Salary Grade Level 23 and her salary increased steadily until it reached $58,317 in 1991.

3. Plaintiff's claims with respect to Weiner's hiring are without merit. As an initial matter, the undisputed facts demonstrate that Weiner was hired in February, 1990, not in May, 1991. See Defendant's Exhibit 2, State Mutual Employee Salary Report. Moreover, the Salary Report demonstrates that Weiner was hired as a Level 23 employee and thus did not receive a pro-

The third job action that plaintiff alleges constitutes sex discrimination took place in January, 1990, after State Mutual terminated Young's employment. Following Young's discharge, State Mutual eliminated his old job title and restructured its departments such that Guarino and Brown received additional managerial responsibilities. Thereafter they reported directly to Phillip Soule, ("Soule"), who was then Vice President in charge of the Group Life and Health Department and Young's former supervisor. Despite the increase in managerial responsibilities, Guarino received no salary increase or change in his title as a result of the reorganization. Paragraph 13 of plaintiff's Complaint alleges that Lawton was overlooked for this promotion in favor of a less qualified male.

Soon after Young's dismissal, Lawton spoke with Soule about the position in the Managed Care area. Soule told Lawton that the job was still open and that she should seriously consider the position because it afforded a "great degree of potential for growth." In March, 1990, plaintiff accepted the position and became the director of Managed Care Development and Support.

In her new position, Lawton reported directly to Penny Noyes ("Noyes"), who was then the Director of Managed Care. Noyes' direct supervisor was the Second Vice President of Employee Benefit Claims and Managed Care Service ("Second Vice President"), who in turn reported to Soule. Plaintiff's salary and salary grade level were unaffected by the transfer. Lawton's duties continued to include management of the Tufts project and marketing to health care networks with which she had worked prior to her transfer, but she also assumed additional responsibilities, including assisting in the development, implementation, and monitoring of health care networks and "special products PPOs" in various cities nationwide as part of a project with Private Health Care Systems, Inc., a State Mutual subsidiary.[4]

In her deposition testimony, Noyes estimated that, during the course of her employment in the Managed Care area, Lawton spent approximately 75% of her time working on complex network arrangements. By contrast, plaintiff estimates that during the months immediately preceding her termination, she spent approximately 30% of her time working on the creation of new networks with Private Health Care Systems, Inc., 30% trying to establish relationships with existing health care networks in other cities, 30% responding to bid specifications for State Mutual's insurance business, and 10% working with existing State Mutual networks.

Yet another of plaintiff's claims of sex discrimination arises from her exclusion from State Mutual's incentive compensation plan. From 1987 to 1990, the plan included only managerial employees at Salary Grade Level 25 and above. In January, 1991, State Mutual expanded its pool of potential participants in the plan to include employees at Levels 23 and 24, provided that they were nominated by upper-level management and met certain performance criteria. The only employee in the Managed Care Group who participated in the plan in 1991 was Noyes, a Level 25 employee.

In Noyes' department there were a total of three Level 23 and 24 employees, including Lawton. Noyes spoke with each of those employees regarding participation in the plan and actually nominated all three, although none of them were ultimately included in the plan. Lawton learned that she had been excluded from the program in March, 1991, after having a discussion with one of the employees who participated in the plan.

In the Spring of 1991, the position of Second Vice President became vacant, and Soule promoted Guarino to fill that vacancy. Plaintiff never complained to anyone about not being appointed to that position. Although

motion in salary level, as plaintiff's Complaint alleges. Finally, plaintiff acknowledges that, as of May, 1991, her position was higher in the company organization than that of Weiner, and for her to assume his position would have been, in effect, a demotion. Lawton Dep. Vol. II at 175.

4. The special, complex PPOs differed from State Mutual's standard product in that they required the development of new systems, new contracts and regulatory approval by State Insurance Departments. Guarino Dep. at 52.

she testified that she "was eligible for [the position]," she "wasn't interested in it." Lawton Dep. Vol. I at 55.

Upon becoming Second Vice President, Guarino undertook a review of each of the units which reported to him in his new position. In his deposition, Guarino testified that he determined that the Managed Care area directed by Noyes was insufficiently profitable and thus he decided to change the emphasis of that department from developing and supporting of complex networks to utilization management.[5] Guarino testified that, as a result of this change in emphasis, and because he believed that Lawton's position involved the development of the special complex networks, he decided to terminate plaintiff. Guarino Dep. at 52, 55. Prior to finalizing his decision, Guarino spoke with Chris Brown to ascertain whether his unit, Product Development, could oversee the development and management of PPO networks upon which Lawton had been working. Brown confirmed that his unit could handle those tasks.

On August 23, 1991, Noyes notified Lawton that she was being terminated and that she would receive severance pay equal to one month's wages. Following her termination, Lawton did not apply for any other position with State Mutual. Defendant maintains that, since Lawton's termination, the company has neither resumed the development of complex PPO arrangements of the kind on which she worked nor hired anyone to replace her. Soule Affidavit at ¶ 4.

Plaintiff's Complaint alleges that State Mutual discriminated against her on the basis of her gender by 1) terminating her employment, 2) failing to promote her (both in the Fall of 1987, when Chris Brown was promoted to the position of Director of Product Development and in March, 1990, when Guarino received additional managerial responsibilities following Young's discharge), 3)

failing to include her in the incentive compensation plan in 1991, 4) failing to rehire her after termination, and 5) paying her less severance pay than it paid to males, all in contravention of federal and state law.[6] In its motion for summary judgment, defendant argues that: 1) Lawton's claims of discrimination based on State Mutual's failure to promote her or to include her in the incentive compensation plan are time-barred, and 2) plaintiff's claim that she was terminated on account of her gender fails to satisfy the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

## II. *Summary Judgment*

Summary judgment shall be rendered where the pleadings, discovery on file and affidavits, if any, show "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the entire record in the light most favorable to the plaintiffs and indulge all reasonable inferences in their favor. *O'Connor*, 994 F.2d at 907.

With respect to a motion for summary judgment, the burden is on the moving party to show that "there is an absence of evidence to support the non-moving party's case." *FDIC v. Municipality of Ponce*, 904 F.2d 740, 742 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986)). If the movant satisfies that burden, it shifts to the non-moving party to establish the existence of a genuine material issue. *Id.* In deciding whether a factual dispute is genuine, this Court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The nonmovant's assertion of mere allegation or

---

5. "Utilization management" entails review by State Mutual employees of the methods by which health care providers treat patients in existing health care networks and aims to discover potential cost savings by identifying unnecessary or inefficient treatment decisions.

6. In her Opposition brief, plaintiff also complains about Guarino's promotion in 1991 to Second Vice President as constituting an act of discrimination. Opposition at 9. Defendant argues, and this Court agrees, that any claim arising from that job action should not be considered inasmuch as it was not alleged in plaintiff's Complaint.

denial of the pleadings is insufficient on its own to establish a genuine issue of material fact. Fed.R.Civ.P. 56(e).

### III. Timeliness of Plaintiff's Claims of Discrimination

Defendant maintains that some of plaintiff's claims of gender discrimination are time-barred because Lawton failed to file complaints in a timely manner with the appropriate agencies, the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD"). State Mutual argues that consequently only Lawton's claim that she was unlawfully terminated is properly before the Court.

■■■ In order to maintain an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), a plaintiff must timely file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See Jensen v. Frank,* 912 F.2d 517, 520 (1st Cir.1990). In a "deferral jurisdiction" such as Massachusetts (i.e., a State with its own civil rights statute and agency), Title VII requires a plaintiff to file her complaint with the appropriate state agency within 240 days of the alleged discriminatory act and with the EEOC within 300 days of the act. 42 U.S.C. § 2000e–5(e); *Desrosiers v. Great Atlantic & Pacific Tea Company, Inc.,* 885 F.Supp. 308, 311 (D.Mass.1995). Massachusetts law, in turn, requires that complaints be filed within six months after the allegedly discriminatory act. M.G.L. c. 151B, § 5.

In the case at bar, Lawton filed a charge of discrimination with the MCAD and the EEOC on February 17, 1992. Because the allegedly discriminatory failures to promote (in the Fall of 1987 and in March of 1990) and to include Lawton in the incentive plan (on March 4, 1991) occurred more than 300 days before plaintiff filed her complaints with those agencies, defendant asserts that her claims are time-barred. Plaintiff responds that there are three bases upon which she is entitled to pursue those claims.

### A. Equitable Tolling Theory

■■■ The 240–day limit imposed by Title VII is, in special circumstances, subject to equitable tolling. *Zipes v. TWA, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132–33, 71 L.Ed.2d 234 (1982). The First Circuit Court of Appeals, however, adheres to a narrow view of equitable exceptions to the limitations periods enumerated by Title VII. *Jensen,* 912 F.2d at 520. To qualify for an exception, a complaining party must allege and prove not only that she had no reason to be aware of the employer's improper motivation when the alleged violation occurred, but also that the employer actively misled her and that she relied on the misconduct to her detriment. *Id.; see also Mack v. Great Atlantic & Pacific Tea Co.,* 871 F.2d 179, 185 (1st Cir.1989). Because plaintiff has neither alleged nor offered any evidence suggesting that 1) the company made misrepresentations to her with respect to the 1987, 1990 and 1991 employment decisions which form the basis for her pre-termination claims, or 2) Lawton acted to her detriment upon any such misrepresentations, this Court concludes that the instant case fails to present exceptional circumstances warranting the application of the equitable tolling doctrine.

### B. Continuing Violation Theory

The First Circuit has distinguished between two kinds of continuing violations: serial violations and systemic violations. Plaintiff argues that defendant has committed each kind of continuing violation and hence all of her claims of discrimination are timely. This Court disagrees.

#### 1. Serial violations

■■■ A serial violation consists of "a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under Title VII." *Sabree v. United Brotherhood of Carpenters and Joiners,* 921 F.2d 396, 400 (1st Cir.1990). In order for the violation to be actionable, at least one act in the series must fall within the limitations period. *Id.; Desrosiers,* 885 F.Supp. at 311. In the case at bar, both parties agree that at least one of the allegedly discriminatory acts

occurred within the limitations period, namely, Lawton's termination in August, 1991. In such a case, "no continuing violation theory is really needed to support a violation as such, but it is needed to determine whether the plaintiff may 'reach back' and be compensated for the earlier claims." *Sabree,* 921 F.2d at 400 (internal citation omitted).

Mindful that the limitations period set forth in Title VII serves to protect employers from the burden of defending claims arising from ancient employment decisions, courts have, as a prerequisite to permitting a plaintiff to reach back and recover for a series of acts outside the limitations period, required aggrieved plaintiffs to prove a "substantial relationship" between the timely and untimely acts. *Id.* at 401 ("[w]ithout a substantial relationship between the timely and the untimely claims, they cannot be viewed as a continuing violation"); *Desrosiers,* 885 F.Supp. at 311. The most important factor to consider in determining whether a "substantial relationship" exists is whether the act outside the limitations period "has the degree of permanence which should trigger an employee's awareness and duty to assert her rights." *Desrosiers,* 885 F.Supp. at 312. The First Circuit has defined "permanence" as "an inquiry into what the plaintiff knew or should have known at the time of the discriminatory act." *Sabree,* 921 F.2d at 402.

If the act outside the limitations period has the requisite degree of permanence, then it is not substantially related to the act within the limitations period and there can be no continuing violation. Thus, when a plaintiff believes that she is being discriminated against "at every turn" of her employment, see *Sabree,* 921 F.2d at 402, she must promptly file her complaint or else lose her claim with respect to those actions occurring outside the limitations period. In contrast, the First Circuit has distinguished the situation of a plaintiff who is unable to appreciate that she is being discriminated against

until she "has lived through a series of acts and is therefore able to perceive the overall discriminatory pattern." *Id.*[7]

In the case at bar, plaintiff points to four acts of discrimination as the basis for her serial violation claim: Brown's promotion in 1987, Guarino's job reorganization in 1990, Guarino's promotion to Second Vice President in 1991 and Lawton's termination in August, 1991. Relying upon *Sabree,* plaintiff argues that, prior to her termination in August, 1991, she did not believe the other employment decisions about which she complains were the result of gender discrimination. Instead, plaintiff maintains that the alleged pattern of discrimination did not become apparent until her termination, when she "had enough of an historical look back to be able to see what those little pieces were actually going to add up to...." Lawton Dep. Vol. I at 73.

This Court concludes that plaintiff's allegation of a serial violation is untenable because Lawton fails to offer any evidence that those actions were motivated by the same discriminatory animus or were related in any way. The employment decisions were made over a period of several years, by different individuals, for different reasons. Accordingly, plaintiff's bare allegation of a serial violation is insufficient to override the temporal strictures set forth in Title VII and M.G.L. c. 151B.

### 2. *Systemic violations*

Plaintiff also argues that her sex discrimination claims are timely because State Mutual has committed a systemic violation of Title VII. In contrast to a serial violation, a systemic violation does not require an identifiable, discrete act of discrimination occurring within the limitation period. *Jensen,* 912 F.2d at 523. The origins of a systemic violation are a discriminatory practice or policy, such that a plaintiff is deemed

---

7. M.G.L. c. 151B, § 5 also permits a plaintiff to recover for a continuing violation. *See Rock v. Mass. Comm'n Against Discrimination,* 384 Mass. 198, 207–08, 424 N.E.2d 244 (1981). The MCAD Rules of Procedure provide that "the six month requirement shall not be a bar to filing in those instances where facts are alleged which indicate

that the unlawful conduct ... is of a continuing nature." 804 CMR 1.03(2). Pursuant to the statute, the cause of action accrues on the happening of an event likely to put the plaintiff on notice. *Wheatley v. American Tel. & Tel. Co.,* 418 Mass. 394, 399, 636 N.E.2d 265 (1994) (and cases cited therein).

to have filed a timely complaint "so long as the policy or practice itself continues into the limitation period." *Id.*

In order to avoid summary judgment, a plaintiff advancing a systemic violation claim must proffer probative evidence of an overarching policy or practice of discrimination. *See id.* ("[a] single instance of favoritism, even if proved, falls considerably short of showing an ongoing pattern and practice"). Moreover, plaintiff's evidence must demonstrate that a discernible, discriminatory policy was in effect during the limitations period. *Mack*, 871 F.2d at 184 (plaintiff's general reference to some vague, undefined policy of discrimination does not suffice to show that "a discernible discriminatory policy was in effect, and injured her, during the limitations period").

Plaintiff maintains that she has adduced sufficient facts through the work of her expert, Dr. Craig Moore, to show a systemic continuing violation. Dr. Moore examined certain data concerning employees at State Mutual to determine whether there existed any statistical evidence of sex discrimination with regard to the salary structure and promotions of the company's employees. After performing a number of statistical tests, including a means test, a median test, and a multiple linear regression analysis, Dr. Moore presented his opinion that:

> there is a reasonable certainty based on the statistical evidence of a disparate treatment of female employees in general with regard to salary increases and promotions during the period in question which supports the [plaintiff's] allegations. . . .

Moore Affidavit at ¶ 16.

State Mutual maintains that Dr. Moore's report is statistically flawed in several respects, including, *inter alia*, 1) it fails to compare comparably situated individuals, and 2) it uses criteria that bear no reasonable relationship to the company's policies on salaries. This Court finds no reason to consider the merits of that argument because, even assuming the admissibility of the statistical analysis, the plaintiff has failed to point to any specific company policy or business practice of which she, *individually*, was a victim.

Defendant persuasively argues that Lawton has made the same mistake in her reliance on statistical data as that of the plaintiff in *Mack:* in an action for disparate treatment, as opposed to one for disparate impact, statistical data is of little probative value and may be inadmissible. 871 F.2d at 184 & n. 3. Consequently, plaintiff's "mere citation of employment statistics and her general references to some vague, undefined policy of discrimination," *id.* at 184, do not suffice to show she was injured by a discernible discriminatory policy that was in effect during the limitations period. In sum, because plaintiff fails to connect the statistical evidence to her specific case other than by reference to a vague, undefined policy, the allegation of a systemic violation is untenable.

This Court observes, in passing, that even had plaintiff filed a timely complaint with respect to the job actions preceding her dismissal, summary judgment in favor of the defendant with respect to those claims would nonetheless be appropriate. First, assignment to the position of Director of Product Development (filled by Christopher Brown in 1987) would not have been a promotion for Lawton. Indeed, after assuming that position, Brown, who had been at the company for nearly seven years, earned an annual salary of $48,000, while plaintiff had been hired at a salary of $50,000.

Second, Guarino received no promotion in March, 1990 following Young's termination. Although Guarino acquired additional managerial responsibilities following Young's termination, he was awarded no attendant salary increase or change in title. Moreover, at the time that the reorganization occurred, plaintiff had just been transferred to the Managed Care Department, admittedly was satisfied with her new position and registered no objection about not being considered for Guarino's position. Plaintiff is, therefore, unable to establish either that Guarino was promoted or that she was interested in the additional duties.

Finally, evidence that Lawton was excluded from the incentive compensation plan on account of her gender is wholly lack-

ing. In disparate treatment cases, "it is boilerplate ... that the absence of any showing that the plaintiff was treated differently from similarly situated employees requires a finding for the defendant." *Thomas v. Digital Equipment Corp.*, 702 F.Supp. 22, 25 (D.Mass.1988), *aff'd*, 880 F.2d 1486 (1st Cir. 1989). Lawton first became eligible to participate in the plan on January 1, 1991, when State Mutual revised its policy to permit employees at salary Level 23 to be included. Although Noyes nominated Lawton and two other individuals from the Managed Care area (one male and one female), none of the three individuals met the performance criteria. Indeed, Noyes was the *only* individual from her area who participated in the plan in 1991; no male employees from that area were invited to participate. Against this factual background, plaintiff's allegation that she was excluded from the Plan on account of her gender is unsupported by the facts.

## IV. *Discriminatory Termination*

When a Title VII plaintiff is unable to offer direct evidence of discrimination by her employer, the burden of producing evidence is allocated according to the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). Under that framework, the plaintiff bears the burden of establishing a *prima facie* case of sex discrimination. Upon meeting that relatively light burden, a rebuttable presumption arises that the employer engaged in impermissible sex discrimination. *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir.1995). The burden then falls upon the employer to articulate a legitimate, non-discriminatory reason for its employment decision.

If the employer carries its burden of production, the presumption of discrimination vanishes and the burden of production shifts back to the plaintiff. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995). At this third and final stage of the framework, plaintiff must produce sufficient evidence, direct or indirect, to show that the reasons advanced by the employer constitute mere pretext for unlawful discrimination. *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 260 (1st Cir.1994). The standard for satisfying the "rebuttal case" varies somewhat under federal and state law. *McDonnell v. Certified Engineering & Testing Co., Inc.*, 899 F.Supp. 739, 745 (D.Mass.1995).

Under the federal standard, a plaintiff at the third stage must introduce sufficient evidence to support two findings: 1) that the employer's articulated reason for the job action is pretextual, and 2) that the true reason is unlawful discrimination. *Smith*, 40 F.3d at 16.

In *Blare v. Husky Injection Molding Systems Boston, Inc.*, 419 Mass. 437, 442–46, 646 N.E.2d 111 (1995), the Massachusetts Supreme Judicial Court adopted a different approach to a plaintiff's rebuttal case for claims brought pursuant to M.G.L. c. 151B. The SJC determined that once a plaintiff has established a *prima facie* case and further shows either that the employer's articulated reasons are a pretext or by direct evidence that the actual motivation was discrimination, she is entitled to recover under Chapter 151B. 419 Mass. at 444–45.

In the instant case, State Mutual maintains that summary judgment is appropriate because plaintiff establishes neither a *prima facie* case that she was terminated on account of her gender nor that the company's non-discriminatory reason for its decision to terminate her was pretextual. Those contentions are considered in turn.

## A. *The Prima Facie Case*

To establish a *prima facie* case of gender discrimination in the context of a reduction in force, a plaintiff must demonstrate that: 1) she is a member of a protected class, 2) she was performing her job at a level that meets her employer's legitimate expectations, 3) she was terminated, and 4) the employer did not treat gender neutrally or that males were retained in the same position. *Holt v. Gamewell Corp.*, 797 F.2d 36, 37–38 (1st Cir.1986). The required *prima facie* showing is a "relatively light" burden. *See Smith*, 40 F.3d at 15; *Woodman*, 51 F.3d at 1091. In the instant action, the

defendant does not dispute that Lawton satisfies the first three elements of her *prima facie* case; rather State Mutual argues that Lawton is unable to demonstrate that it did not treat gender neutrally or that males were retained in the same position. *See Holt,* 797 F.2d at 38; *Hebert v. Mohawk Rubber Co.,* 872 F.2d 1104, 1111 (1st Cir.1989).

▆▆ In her effort to establish a *prima facie* case, Lawton cites *Hooker v. Tufts University,* 581 F.Supp. 98, 103 (D.Mass.1983) for the proposition that an individual disparate treatment plaintiff "always retains the option of introducing statistical evidence in an attempt to meet [that] threshold [showing]." Unfortunately, she fails to explain how her statistical evidence satisfies that function in the case at bar. More specifically, plaintiff has not demonstrated the connection between her claim of unlawful termination and statistics relating to defendant's salary structure and promotional opportunities for women at the company. In short, because disparate treatment cases focus less on a pattern of discrimination and more on how a particular individual is treated, see *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 848 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994), plaintiff's statistical evidence provides less assistance in making out a *prima facie* case of discriminatory termination than it would in a discriminatory impact case.

▆▆ This Court concludes that plaintiff has failed to establish a *prima facie* case of gender discrimination. Even had she overcome that initial hurdle, however, Lawton fails, for the reasons set forth below, to meet her burden at the third and final stage of the *McDonnell Douglas* framework.

**B.** *Defendant's Non–Discriminatory Reason for the Termination*

▆▆ Assuming, *arguendo,* that plaintiff had established a *prima facie* case of gender discrimination, defendant bears the burden of articulating a legitimate, non-discriminatory reason for its employment decision. *Smith,* 40 F.3d at 16; *see also Wheelock College v. Mass. Comm'n Against Discrimination,* 371 Mass. 130, 138, 355 N.E.2d 309 (1976). In the case at bar, State Mutual

carries that burden by its assertion that, after Guarino reviewed the direction and organization of the Group Life and Health Insurance Division in an effort to reduce costs, the company decided to shift its emphasis away from the complicated type of PPO product upon which Lawton had worked a great deal while employed there. In his deposition, Guarino testified that he generally knew that her primary responsibility was "developing [those] special PPO operations." Guarino Dep. at 54. State Mutual therefore contends that Guarino's decision to discharge Lawton reflected a business judgment by the company about the nature of its work. Because defendant has proffered a legitimate, non-discriminatory reason for terminating Lawton, the presumption of illegal sex discrimination raised by her arguably sufficient *prima facie* case disappears and the burden of production reverts to the plaintiff. *Smith,* 40 F.3d at 16.

**C.** *Pretext*

▆▆ As noted earlier, under the federal standard, a plaintiff at the third stage of the *McDonnell Douglas* framework must introduce sufficient evidence to support two findings: 1) that the employer's articulated reason for the job action is pretextual, and 2) that the true reason is unlawful discrimination. *Smith,* 40 F.3d at 16. The First Circuit requires "not only minimally sufficient evidence of pretext, but evidence that overall reasonably supports a finding of discriminatory animus." *LeBlanc,* 6 F.3d at 842–43 (internal quotation omitted). Accordingly, a plaintiff "cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer." *Id.* at 843. Although the plaintiff may rely on the same evidence to prove both pretext and discrimination, the evidence must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus. *Smith,* 40 F.3d at 16.

In the case at bar, defendant maintains that plaintiff's evidence of pretext is insufficient to avert summary judgment. State Mutual notes that, during discovery, plaintiff

"described an elaborate and convoluted scheme [which purports to demonstrate] that State Mutual's conduct was a pretext for sex discrimination." Defendant's Memorandum at 16. Under that scheme, there was a planned corporate reorganization under which all product development work from three State Mutual divisions (Life, Pension, and Group) was to be performed at the corporate level under Jeremy Brown, the Vice President of Product Strategy and Development and the brother of Chris Brown. Because a State Mutual policy would have precluded Chris Brown from reporting to his brother, Lawton alleges that Chris Brown and Soule, the Vice President of Group Insurance Department, sought to keep the product development function in the Group division in order to save Chris Brown's job. Accordingly, Lawton alleges that Soule, with whom she was not friends, saved Chris Brown's job out of friendship and at her expense.

To accomplish that goal, Soule and Chris Brown allegedly attempted to enhance the strength of the department by "maneuvering to make certain that the department gained more work, more individuals, and generally grew in size." Lawton Dep. Vol. II. at 183–184. That resulted in the transfer of Lawton's managed care development responsibilities into Soule's department and allowed Soule to argue that "the product development function as it pertained to the Group department was an integral part of the Group department and shouldn't be separated from it." Id. at 187. Under plaintiff's theory, the result was that while product development from the Life and Pension divisions were transferred to the corporate level, Soule managed to keep product development in his Group department.

■■■ This Court agrees with the defendant that, even assuming that the elaborate scheme to keep product development in the Group area existed, it is not evidence of sex discrimination. "At most, it would evidence that Mr. Soule favored Chris Brown because of his family relationship to another State Mutual executive." Defendant's Memorandum at 17–18. In *Foster v. Dalton*, 71 F.3d 52, 56 (1st Cir.1995), the First Circuit

observed that the remedial reach of Title VII is not limitless and in fact does not outlaw cronyism, as deplorable as that practice is. Indeed, an employer "can hire one person instead of another for any reason, fair or unfair, without transgressing Title VII, as long as the hiring decision is not spurred by race, gender, or some other protected characteristic." *Id.* Moreover, Title VII does not grant relief to a plaintiff who has been discharged unfairly, "even by the most irrational of managers," unless the facts and circumstances indicate that discriminatory animus was the reason for the termination. *Smith*, 40 F.3d at 16. Accordingly, even if the case at bar constitutes one of "undiluted favoritism, unmixed with [gender] animus," see *Foster*, 71 F.3d at 57, Title VII affords no remedy.

■■■ Plaintiff advances two additional arguments in her attempt to demonstrate pretext. First, Lawton asserts that the statistics gathered by her expert can be used to prove pretext in a disparate treatment case. Even assuming the validity of Dr. Moore's statistical analysis with respect to salaries, salary grades and promotions, however, this Court doubts the probative value of that data in rebutting the legitimate business reason offered by the company for plaintiff's *termination*. In *LeBlanc*, the First Circuit noted that because the focus of a disparate treatment case is on how a particular individual was treated, statistical evidence, in and of itself, "rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee." 6 F.3d at 848. In the case at bar, where plaintiff has failed to connect her expert's statistics to State Mutual's specific decision to terminate her, this Court concludes that plaintiff's statistical evidence does not suffice to demonstrate pretext. *See Gadson v. Concord Hosp.*, 966 F.2d 32, 35 (1st Cir.1992).

Plaintiff finally attempts to cast doubt upon State Mutual's articulated reason for her termination by pointing out two factual issues: 1) the disparity between what Guarino believed Lawton's job duties were prior to her discharge and what plaintiff stated her job duties were in the Summer of 1991, and 2) State Mutual's alleged creation of special,

complex PPO networks after Lawton's termination.

With respect to the first factual issue raised by plaintiff, it is important to remember that, when assessing pretext, the Court's focus must be on the perception of the decisionmaker, i.e., "whether the employer believed its stated reason to be credible." *Mesnick v. General Electric Co.,* 950 F.2d 816, 824 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Defendant persuasively contends that "[a]t best, Lawton's proof merely shows that Guarino was mistaken about his belief as to Lawton's particular job duties" in July, 1991. Reply Brief at 13. Evidence of mistaken good-faith belief, however, fails to suffice as evidence of pretext. *See Gadson,* 966 F.2d at 35; *Morgan v. Massachusetts Gen'l Hosp.,* 901 F.2d 186, 191 (1st Cir.1990) (although worker could demonstrate that employer was wrong in believing he had started a fight that led to his termination, such evidence was not enough to show race was motivating factor).

Plaintiff finally attempts to demonstrate pretext by arguing that, even after her discharge, defendant continued to develop special, complex PPOs. Specifically, plaintiff points out networks established by defendant in Abilene, Texas, the "Suncoast" network in Florida, and "South Central Health Care" in Mississippi. The uncontroverted evidence indicates, however, that the Mississippi network was created in the mid–1980s, *before* Lawton was hired. Noyes Dep. at 33. Moreover, defendant insists that neither the Mississippi nor the Abilene networks were of the complex nature that Lawton worked on while employed by the defendant. Indeed, Noyes' undisputed testimony is that the Abilene network merely extended an already-existing relationship with a client to a part of the country where defendant did not normally operate. Noyes Dep. at 34. Defendant maintains that it

> has never suggested that it went out of the business of creating health care networks using existing documents for existing

clients such as the Abilene network or that it complete[ly] abandoned the creation of simple networks, such as South Central.... At best this evidence shows that in two isolated instances during the three year period following her termination that Guarino's division worked on creating simple special networks for existing clients when the Product Development Department needed minor modifications to its documents.

Defendant's Reply at 14–15. This Court agrees with the defendant that plaintiff's purported evidence does not suffice to demonstrate pretext.

Mindful of the fact that courts must not sit as "super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions," *Mesnick,* 950 F.2d at 825, this Court concludes that the adequacy of plaintiff's evidence of discriminatory animus is insufficient to create a triable issue of fact. Accordingly, defendant's motion for summary judgment with respect to plaintiff's claim of unlawful termination will be ALLOWED.[8]

## V. *Plaintiff's Severance Package*

After dismissing Lawton on August 23, 1991, State Mutual awarded plaintiff severance pay in an amount equal to one month's salary. In ¶ 16 of her Complaint, plaintiff states that the severance package she received was less favorable than that generally given to males. Plaintiff has, however, failed to offer any evidence supporting that allegation. Moreover, defendant has submitted the affidavit of Judith Fleming, an employee in defendant's Human Resources Department, which declares that 1) State Mutual offered severance to exempt, non-officer level employees terminated during 1991 based on a set formula, and 2) under that formula, an exempt employee who worked for defendant less than five years received one month's severance pay. The affidavit concludes that Lawton had been employed by State Mutual for less than five

---

8. Although, the federal and state standards differ somewhat at stage three of the *McDonnell Douglas* analysis, see the beginning of Section IV, *supra,* an identical result is reached with respect to plaintiff's Chapter 151B claim because Lawton fails to offer evidence that defendant's nondiscriminatory reason is pretextual.

**346**

years, and that therefore she properly received one month's severance. Because a prerequisite to a claim of sex discrimination is a showing that plaintiff was treated differently from similarly-situated males, see *Thomas v. Digital Equipment Corp.*, 702 F.Supp. 22, 25 (D.Mass.1988), *aff'd*, 880 F.2d 1486 (1st Cir.1989), and further because the undisputed evidence demonstrates that defendant did not deviate from its standard formula in calculating plaintiff's severance package, summary judgment in favor of defendant on this claim will be ALLOWED.

### VI. *Failure to Rehire*

■ Plaintiff's final claim is that State Mutual failed to rehire her on account of her gender. Defendant argues that summary judgment with respect to that claim is appropriate because Lawton failed to include it in her original charge of discrimination filed with the EEOC and MCAD. *See Pakizegi v. First National Bank of Boston*, 831 F.Supp. 901, 910 n. 1 (D.Mass.1993), *aff'd*, 56 F.3d 59 (1995). In addition, plaintiff acknowledges that she never applied for any position at State Mutual following her termination, see Lawton Dep. Vol. II. at 136–138, nor does she offer any evidence that State Mutual rehired similarly situated males following the reduction in force. For those reasons, summary judgment in favor of the defendant with respect to plaintiff's claim of failure to rehire will be ALLOWED.

### ORDER

For the foregoing reasons, defendant State Mutual's motion for summary judgment is ALLOWED.

So ordered.